UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | | |
|---|---|---|
| Jenny M. Johnson, individually and on behalf of a class of persons similarly situated, and on behalf of the Providence Health & Service 403(b) Value Plan, | ) ) ) ) ) ) | Complaint—Class Action |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| PROVIDENCE HEALTH & SERVICES, PROVIDENCE HEALTH & SERVICES HUMAN RESOURCES COMMITTEE, and JOHN AND JANE DOES #1–25, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)**

## I.    INTRODUCTION

1.    Plaintiff Jenny M. Johnson, individually and on behalf a class of all other persons similarly situated ("Plaintiff") in the Providence Health & Services 403(b) Value Plan (the "Plan"), and on behalf of the Plan, brings this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against Providence Health & Services ("Providence"), the Providence Health & Services Human Resources Committee (the "Committee"), and its members during the proposed class period ("Jane and John Does 1–25").

2.     Throughout the Class Period (defined below), Defendants allowed the Plan's recordkeeper, Fidelity, to receive excessive and unreasonable compensation through: (1) direct "hard dollar" fees paid by the Plan to Fidelity; (2) indirect "soft dollar" fees paid to Fidelity by non-Fidelity managed mutual funds added and maintained in the Plan to generate fees to Fidelity; (3) fees collected directly by Fidelity from Fidelity-managed mutual funds, added and maintained in the Plan to generate fees to Fidelity; and (4) float interest, freedom to market rollover-materials to Plan participants, and other forms on indirect compensation.

3.     In order to provide for these revenue streams, Defendants larded the Plan with excessively expensive mutual funds — to the exclusion of superior alternatives — which in turn paid Fidelity out of the excessive fees they collected from Plan investments.

4.     These mutual funds collectively underperformed superior alternative funds for a variety of reasons, including the fact the alternatives charged lower fees by, among other things, removing the additional payments to Fidelity.

5.     Only in 2016 did Defendants begin to capture some of these excessive fees for the benefit of the Plan and move Plan assets into less expensive (and often otherwise identical) investment alternatives. But even with these changes, Fidelity's compensation remains double the market rate for the services provided.

6.     Plaintiff brings this action by and through their undersigned attorneys based upon their personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations in this Complaint.

## II.  NATURE OF THE ACTION

7.     The ERISA fiduciary obligations of retirement plan fiduciaries to the participants and beneficiaries of a plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

8.     When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

9.     Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties owed to the Plan and its participants, including Plaintiff.

10.     Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan. The individual Defendants were officers or employees of Providence. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries with respect to managing the Plan's assets, Defendants forced the Plan into investments that charged excessive fees that benefitted Fidelity at the expense of the Plan.

11. This class action is brought on behalf of participants in the Plan who participated from November 28, 2011 through the present (the "Class Period").

## III. JURISDICTION AND VENUE

12. **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

13. **Personal Jurisdiction.** This court has personal jurisdiction over each of the Defendants because they reside and/or transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Washington.

14. **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in Renton, Washington, within this District, the breaches of ERISA took place in this District, and/or a Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in this District and because a

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV. PARTIES

15. Plaintiff Jenny M. Johnson is a resident of Tacoma, WA. She participated in the Plan during the entire Class Period.

16. Plaintiff's individual account in the Plan was defaulted into the Fidelity Freedom 2040 Fund, where her retirement assets were invested throughout the Class Period. Plaintiff, like substantially all plan participants and beneficiaries, was not provided any information regarding the substance of deliberations, if any, of Defendants concerning the Plan's menu of investment options or selection of service providers during the Class Period. Plaintiff otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments offered in the Plan beyond what was provided to her by the Plan. Plaintiff discovered her claims shortly before commencing this action.

17. Defendant Providence Health & Services, the Plan Sponsor, is a health care system operating in approximately 900 locations across the western United States, with its principal place of business in Renton, Washington.

18. Defendant Providence Health & Services Human Resources Committee is comprised of employees of Providence. The Committee has the authority to determine the investment funds made available under the Plan and to

develop and oversee the implementation of any investment education program.

19. Defendants Jane and John Does 1–25 are members of the Committee and/or Providence executives in charge of Human Resources during the Class Period, who are unknown to Plaintiff.

20. Defendants are, or during the Class Period were, fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

## V. FACTS

### A. The Plan and Administration of the Plan

21. The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

22. The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

23. The Plan covers eligible employees of Providence, including its subsidiaries.

24. Providence is the Plan Administrator. Accordingly, it is responsible for selecting, monitoring, and removing the investment options in the Plan. At some or all times during the Class Period, it designated the Committee to

carry out this duty. The Committee's individual members are employees and officers of Providence.

25. Participants in the Plan have the opportunity to direct the investment of the assets allocated to their individual accounts into the investment options approved by the Committee and offered by the Plan, and the return on those investments are credited to each participant's account. Participants who do not direct the investment of the assets are invested in the Plan's default investment option, the Fidelity Freedom target date funds.

26. During the Class Period, the Plan has invested in at least 50 different investment options, of which 17 were managed by Fidelity and at least 24 more paid revenue-sharing to Fidelity.

27. The Plan's benefits are funded by participants' voluntary tax-deferred and after-tax (Roth) contributions and by employer matching contributions.

28. The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2016 plan year the Plan had 76,165 participants with account balances.

29. At all relevant periods, Fidelity served, and continues to serve, as the Plan's Recordkeeper.

30. The Recordkeeper of a defined contribution plan, like the Plan, maintains participant account balances, provides a website and telephone number for Plan Participants to monitor and control their Plan accounts, and provides various other services to the Plan.

31. These services are highly commoditized, with little or nothing distinguishing the services provided by one recordkeeper over another.

32. For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industries have developed a variety of pricing and fee structures.

33. At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

34. The compensation Fidelity received for its recordkeeping and administration of the Plan was excessive and unreasonable, and the Defendants breached their fiduciary obligations under 29 U.S.C. §1104(a) to ensure that Fidelity's compensation was no more than reasonable.

35. The Committee also failed to have a prudent process for evaluating the amount and reasonableness of this compensation. Instead of evaluating the cost of these services in the marketplace, the Committee permitted Fidelity to administer and do the recordkeeping for the Plan without meaningful market competition. At no time before 2016 did Defendants limit or curtail Fidelity's growing compensation — rather, Fidelity was allowed to generate ever higher fees despite costs which were either stable or falling.

36. Failing to do so constituted a breach of the duties of prudence in violation of 29 U.S.C. §1104(a) and cost the Plan millions of dollars in excessive fees charged directly by Fidelity or collected by Fidelity from the Plan's investment options through revenue sharing.

9

37. Pursuant to 29 U.S.C. §1109, the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

## B.   Fidelity's Sources of Compensation

38. Defendants caused the Plan to purchase recordkeeping, administration, investment management, and other services from various institutions and entities. The fees paid to Fidelity, are, and have been, unreasonable and excessive; especially in light of the Plan's enormous size and asset value. In order to provide for this compensation to Fidelity, Defendants have included inferior and imprudently selected investment options as core Plan investments.

39. Defendants have caused the amounts that the Plan pays for these services to be assessed against Plan participants' accounts.

40. Defendants have caused or allowed Fidelity to receive payment in at least five ways:

> (A)  By direct disbursement from the Plan to the entity providing the service;
>
> (B)  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers;
>
> (C)  By receiving, or having the opportunity to receive, Revenue Sharing payments from mutual funds offered through the

Plan's Brokerage-Window, through which participants can invest in options not vetted as core investments for the Plan,

(D) By profiting from the inclusion of proprietary Fidelity-managed mutual funds, which charged fees to all investors, including the Plan; and

(E) Through other sources of compensation, including float interest and access to plan participants for marketing purposes.

### i. "Hard Dollar" Payments to Fidelity

41. Payments in the form of direct disbursements from the Plan to an entity providing a service to the Plan are characterized as "Hard Dollar" payments or "Direct Compensation".

42. Plan Sponsors, like Defendants, generally disclose to government regulators, in one form or another, Hard Dollar payments made from the Plan to service providers.

43. When such disclosures are made, understanding the Plan's service provider expenses for a given year *appears* straightforward: the Plan transfers funds in a stated amount to the provider in return for the provider's services. From this, Plan participants and government regulators surmise that the Plan expended the stated amount in exchange for the services.

44. Fidelity received the following Hard Dollar payments from the Plan according to forms filed by the Plan with the United States Department of Labor.

| Year | Hard-Dollar Payments |
|------|----------------------|
| 2011 | $88,753 |
| 2012 | $74,700 |
| 2013 | $66,687 |
| 2014 | $71,467 |
| 2015 | $97,639 |

**ii.  Revenue Sharing Payments to Plan Service Providers**

45. While the hard dollar fees above appear modest, the vast majority of Fidelity's compensation came in the form of Revenue Sharing.

46. Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

47. Industry commentators and analysts generally define Revenue Sharing as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

48. For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and collective trust, guaranteed investment

contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

49.  In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee (an expense ratio) that is not the true price for which the Fund will provide its service.

50.  Instead, the agreed asset-based fee includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

51.  The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

52.  As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

53.  The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and effort to monitor revenue sharing transfers; the diligence with

13

which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

54. To severely reduce, or eliminate Hard Dollar payments altogether, a plan's fiduciaries and a Fund may agree to set a Fund's asset-based fee (its expense ratio) at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover all other Plan services *and more*. This causes a plan's recordkeeping fees to appear deceptively low in disclosures to Plan participants and government regulators.

55. When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

56. Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, and service providers; Revenue Sharing is not always captured and used for the benefit of the Plan and the participants.

57. In addition, Plan fiduciaries may limit their selection of funds to only those funds which provide sufficient revenue sharing, thus foregoing superior

investment alternatives and selecting or maintaining inferior investment options based upon revenue sharing relationships. These alternatives include identical share classes of the same mutual funds that charged lower fees because they do not pay revenue sharing, institutional products by the same fund managers which offer materially identical services for even lower cost, or superior alternatives offered by different managers who are unwilling to pay revenue sharing to the Plan recordkeeper.

58. Plan fiduciaries may do this to conceal the true amount of compensation paid to the Recordkeeper or to reduce the plan sponsor's cost at the expense of plan participants.

59. Nearly all of the twenty-six actively managed mutual funds included in the Plan paid revenue sharing to Fidelity.[1]

60. In determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, all sources of compensation, including revenue sharing, must also be taken into account.

61. Adding revenue sharing from non-Fidelity mutual funds to the Hard Dollar fees discussed above, Fidelity's compensation from external, non-Fidelity funds, was:

---

[1] The Plan's 2015 Form 5500 filings with the Department of Labor do not disclose revenue sharing from the Calvert Social Index I Fund, the Dreyfus High Yield I fund, or the American Funds Large-Cap Growth Fund.

| Year | Hard-Dollar Payments | Non-Proprietary Revenue Sharing | External Compensation Per Participant |
|------|------|------|------|
| 2011 | $88,753 | $2,393,005 | $34.80 |
| 2012 | $74,700 | $1,900,649 | $42.53 |
| 2013 | $66,687 | $2,971,151 | $50.12 |
| 2014 | $71,467 | $2,700,088 | $35.43 |
| 2015 | $97,639 | $2,539,550 | $46.81 |

62. It was not until 2016 that the Defendants arranged to have a portion of the non-proprietary revenue sharing rebated to the Plan. Defendants' 2016 Form 5500, filed with the United States Department of Labor in October 2017, disclosed that Fidelity received direct compensation of -$1,726,918 in the 2016 Plan year. This is the first time Fidelity rebated to the Plan revenue sharing payments for the benefit of the Plan. Nevertheless, Fidelity received approximately $400,000 more in revenue sharing from external funds in 2016 than it rebated to the Plan.

### iii. Proprietary Revenue Sharing on Fidelity Funds

63. In addition to non-Fidelity funds paying revenue sharing to Fidelity, the Plan has included at least 17 Fidelity-managed mutual funds, of which 14 were actively-managed funds in which the Plan invested in the "K" share class.

64. Fidelity routinely offers revenue sharing to other vendors who place investments in the K share class of its funds, and, upon information and belief, attributes revenue sharing payments to its recordkeeping division when, as here, Fidelity is the Plan recordkeeper.

65. In addition, Defendants included Fidelity index funds under the brand name "Spartan" and a Fidelity-managed Money Market Fund, the Fidelity U.S. Government Reserve Fund, which provided additional profits to Fidelity.

66. In 2015 alone, Fidelity received over $9 million in fees from the Fidelity-managed mutual funds in the Plan, of which a significant portion was allocated as profit for Fidelity's administrative and recordkeeping services.

67. While the amount of internal revenue sharing was never disclosed to participants, upon information and belief Plaintiff alleges that these payments exceeded $1 million each year of the class period and, in 2016 alone, Fidelity's internal revenue sharing from the Plan was between $1.7 million and $5.4 million.

### iv. Other forms of compensation

68. The Plan also included investments offered through Fidelity's "Brokerage Link" product, which offered an assortment of mutual funds for Plan investment that paid revenue sharing to Fidelity.

69. While the amount of this compensation cannot be calculated by Plaintiff at this time, the amount of such fees can be significant as the Plan maintained

tens of millions of dollars in brokerage window investments throughout the Class Period.

70. Likewise, as Recordkeeper, Fidelity had access to valuable information it could use to convince Plan participants to invest in other Fidelity products, including rolling out of the Plan and into Fidelity retail IRAs upon their departure from Providence.

71. Prudent fiduciaries consider all compensation to a Plan's recordkeeper when determining whether fees are reasonable.

## C.   Excessive Recordkeeping Fees

72. Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

73. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals, every 3–5 years.

74. Defendants failed to do so.

75. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of

providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

76. Large defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per participant fees charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

77. Many of the Plan's investment options revenue-shared with the Plan's record-keeper, Fidelity. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's record-keeper putatively for providing recordkeeping and administrative services for the mutual fund.

78. Form 5500s filed by the Plan with the United States Department of Labor show that during the Class Period Fidelity received the majority of its

compensation for recordkeeping the Plan from asset-based revenue-sharing.

79. Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives — as well as other compensation such as interest earned on assets moving into and out of the Plan, called "float" — to ensure that the record-keeper is not receiving unreasonable compensation.

80. Even assuming that only 30 basis points of the fees charged on the proprietary K-share class funds, and none of the fees charged Spartan or Money Market Fund, were for administrative services, the combined Hard-Dollar, non-proprietary revenue sharing (external compensation), and proprietary fees for internal revenue sharing to Fidelity for recordkeeping the Plan would total:

| Year | Total Recordkeeping Fee | Per-Participant RK Fee |
|------|-------------------------|------------------------|
| 2011 | $4,423,562 | $83.44 |
| 2012 | $4,866,478 | $87.28 |
| 2013 | $6,546,283 | $108.00 |
| 2014 | $6,233,920 | $96.75 |
| 2015 | $7,019,868 | $92.64 |
| 2016 | $5,794,655 | $76.08 |

81. Market prices for mega-plans like the Plan (i.e., plans with more than $1 billion in assets) are typically considerably lower because of available

economies of scale and the bargaining power exerted by prudent fiduciaries. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (recordkeeping fees were $32 per participant in 2012); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees were $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (reversing grant of summary judgment where plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65 per participant for a smaller plan than the Providence Plan); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping, also involving a smaller 401(k) plans).

### D.   Defendants' Imprudent Selection and Retention of Options Paying Fees to Fidelity

82.   In order to facilitate revenue sharing and proprietary Fidelity Funds in the Plan, Defendants maintained investment options despite no expectation they would outperform cheaper or superior alternatives. While Plaintiff lacks knowledge of Defendants' fiduciary selection process, a long series of decisions involving proprietary and non-proprietary investments indicate a failure by Defendants to prudently select and monitor the investment options in the Plan. For example:

### i.   Alternatives with Lower-Cost and Better Prospects for Future Performance Were Available for the Plan

21

83. Large retirement plans, like the Plan, have substantial bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor Magazine (Jan. 2011).[2]

84. Lower-cost institutional share classes of mutual funds are available to institutional investors, like the Plan, that meet the minimum investment amounts for these share classes. In addition, large retirement plans can invest in collective investment trusts or hire investment advisers directly to manage separate accounts for the plan within plan-specific investment parameters and with even lower investment management fees. As the Department of Labor recognized, large defined contribution plans with assets over $500 million "can realize substantial savings" through separate accounts, including "[t]otal investment management expenses can commonly be reduced to *one-fourth* of the expenses incurred through retail mutual funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study*

---

[2] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

*of 401(k) Plan Fees and Expenses* §2.4.1.3 (Apr. 13, 1998) (emphasis added).[3]

85. Despite these lower-cost options, Defendants have invested, and continue to invest, Plan assets in mutual funds with a higher cost than were and are available for the Plan based on its size, such as separate accounts and collective trusts.

86. For the *exact same mutual fund option*, the Plan has offered higher-cost share classes of *identical* mutual funds than were available to the Plan, without prudently considering these lower-cost identical alternatives or recapturing the excessive fees for the benefit of the Plan.

87. The lower-cost identical mutual funds to the Plan's investments include and have included at least 17 mutual funds selected and maintained in the Plan by Defendants. These include the following:

| Plan Mutual Fund | Plan Assets[4] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|---|
| PIMCO Total Return Admin | $89,408,641 (2014) | 71 bps | I share class | 46 bps | 54.3% |
| PIMCO Total Return Admin P | $95,125,730 (2016) | 56 bps | I share class | 46 bps | 21.7% |
| Columbia Acorn Int'l Z | $7,886,061 | 97 bps | Y and I share classes | 87 bps | 11.5% |

---

[3] Available at https://www.dol.gov/ebsa/pdf/401kRept.pdf.
[4] Plan Assets are identified based on the Plan's 2015 Form 5500 filing with the U.S. Department of Labor, except for the Freedom Funds, where 2016 asset levels are used because the Z6 share class did not exist in 2015. If the fund was removed from the Plan prior to December 31, 2015, a different year is indicated.

| Plan Mutual Fund | Plan Assets[4] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|---|
| Amana Income | $11,564,562 (2014) | 112 bps | Inst'l class | 87 bps | 28.7% |
| American Funds Europacific Growth R5 | $105,777,770 | 53 bps | R6 class | 49 bps | 8.2% |
| PIMCO Developing Local Mkts A | $6,546,930 | 110 bps | Inst'l Class | 85 bps | 29.4% |
| JP Morgan Large Cap Growth Select and R5 | $148,126,736 | 93 bps & 54 bps | R6 | 44 bps | 111.4% |
| Wells Fargo Emerging Mkts Equity I | $32,410,941 | 122 bps | R6 | 115 bps | 6.1% |
| American Century Growth Inv. | $160,633,047 (2014) | 97 bps | Institutional | 78 bps | 24.4% |
| Allianz AGIC Growth A | $94,609,962 (2011) | 101 bps | Institutional | 76 bps | 32.9% |
| Fidelity Freedom Funds K | $1,575,208,568 (2016) | 44 bps – 64 bps | Z6 | 34 bps – 54 bps | 18–29% |
| Fidelity Contrafund K | $116,665,750 (2016) | 61 bps | K6 | 45 bps | 35.6% |
| Vanguard Inst'l. Index | $205,662,430 (2016) | 4 bps | Inst'l Plus | 2 bps | 100% |

88.   As shown above, the Plan paid fees between 6% and 111% higher than they

should have paid for the *identical* mutual fund product.

89.  In addition, substantially identical non-mutual fund institutional products, such as collective trusts and separate accounts, were also available but not chosen for many of the Plan's Fund.

90.  The Plan invests over $95 million in the Fidelity Growth Company mutual fund, in the K share class. Since December 13, 2013, Fidelity has offered an institutional product, the Fidelity Growth Company Commingled Pool, which charges 43 bps instead of the 66 bps charged by the mutual fund in the Plan. The Commingled Pool and mutual fund have identical managers, led by Steven Wymer, as well as identical holdings and strategies. However, because the Plan is paying 53% more for the K shares, their returns are lower by nearly an identical amount. The failure to utilize this substantively identical investment option continues to cost the Plan in excess of $200,000 per year in higher fees and lower performance.

91.  Similarly, the Plan invests over $116 million in the Fidelity Contrafund mutual fund, also in the K share class. Since January 17, 2014, Fidelity has offered an institutional product, the Fidelity Contrafund Commingled Pool, which charges 43 bps instead of the 61bps charged by the mutual fund in the Plan. Other defined contribution retirement plans, such as the Teradata Savings Plan and the Niscourse Inc. Retirement Savings Plan, invest in the Fidelity Contrafund Commingled Pool despite having far less money invested in Contrafund.

92.  As above, the commingled pool and mutual fund have identical managers, holdings, and strategies. However, because the Plan is paying 42% more for the K shares, their returns are lower by nearly an identical amount. The failure to utilize this substantively identical investment option continues to cost the Plan in excess of $200,000 per year in higher fees and lower performance.

93.  Likewise, the Plan invested and continues to invest in a series of actively-managed target date funds, the Fidelity Freedom Funds. However, Fidelity, through its institutional arm, Pyramis Global Advisors, offers substantially identical managed target date funds at significantly lower cost.

94.  Fidelity established Pyramis in 2005 to compete for institutional pension plan business. Pyramis does not offer mutual funds. Rather, it offers and manages nonregistered, institutional commingled funds, which are substantially similar to mutual funds except that these commingled funds carry generally lower fees and costs than those charged by comparable Fidelity Funds. Pyramis also offers separately-managed accounts, which offer the same investment strategies and asset classes as mutual funds and commingled funds, except that there is only one client retirement plan invested in the fund. Separately managed accounts provide very large clients such as retirement plans with assets exceeding $1 billion ("mega plans") the opportunity to negotiate even lower retirement investment-related fees. While fees for the Plan's Fidelity target date funds exceeded

50 bps, equivalent Pyramis funds, including the FIAM Target Date Commingled Pools, were available at dramatically lower cost.

95. Although Defendants did make certain changes to some of the mutual fund options in 2016, these changes were incomplete and far too late.

96. Prior to 2016, the Plan invested in the "Select" share class of the JP Morgan Large Cap Growth Fund, which charged the Plan fees of 93 bps per year. During 2016 the Plan moved to the cheaper "R5" share class of the Fund, which charges 54 bps, but with Plan assets of over $130 million invested in the Fund, the Plan qualifies for the "R6" class of the mutual fund, with fees of only 44 bps. In fact, the minimum balance to qualify for the R6 share class is, and during the Class Period has been, only $15 million. Thus, the Plan paid more than twice as much as it should have for the identical JP Morgan Large Cap Growth Fund, and continues to pay over $130,000 per year more in fees that it would in the R6 share class of that Fund alone.

97. Prior to 2016, the Plan invested in the "Administrative" share class of the PIMCO Total Return Fund, which charged the Plan fees of 71 bps per year. During 2016, the Plan moved a portion of the assets to the cheaper "P" share class, reducing their fees to 56 bps. On December 31, 2016, the Plan had $13,896,578 invested in the Administrative share class and $95,125,730 invested in the P share class. However, PIMCO offers any plan investing over $1 million the option to invest in the Institutional share class, which charges only 46 bps. Thus, the Plan paid 54% more than it should have for

the assets in the Administrative share class and 22% more than it should have for assets in the P share class, causing the Plan to pay over $125,000 per year in excessive fees for identical mutual funds.

98. Prior to 2016, the Plan invested in the R5 share class of the American Funds Europacific Growth Fund, which charged the Plan fees of 53 bps per year. It was not until 2016 that the Plan moved to the R6 share class of the identical fund, and, in the process, reduced the Plan's fees to 50 bps.

99. Prior to 2016, the Plan invested in the Z share class of the Columbia Acorn International Fund, which charged the Plan fees of 101 bps per year. Although Defendants removed the Fund entirely from the Plan in 2016, the Fund also offered "R5" and "Y" share classes which would have charged 95 bps and 90 bps respectively for the identical mutual fund, reducing fees by 11 bps for the Plan's investments in that Fund, which were approximately $8 million during the class period.

100. Prior to 2016, the Plan invested in the "I" share class of the Wells Fargo Emerging Markets Fund, which charged the Plan fees of 122 bps per year. It was not until 2016 that the Plan moved to the R6 share class of the identical fund, and, in the process, reduced the Plan's fees to 115 bps.

101. Prior to 2016, the Plan invested in the "Investment" share class of the American Century Growth Fund, which charged the Plan fees of 97 bps per year. It was not until 2016 that the Plan moved to the R6 share class of the identical fund, and, in the process, reduced the Plan's fees to 78 bps. With

$160,633,047 invested by the Plan in the Investment share class as of 2013, the fee savings would have been over $300,000 per year if Defendants had instead selected the identical R6 share class.

102. In addition, Defendants continue to invest a substantial percentage of the Plan's assets in the "K" share class of the Fidelity Freedom Funds even though Fidelity now offers a "Z6" share class which is 10 bps less expensive for the identical investments. As of December 31, 2016, the Plan invested over $1.575 billion in Fidelity's Freedom Funds. If Defendants moved from the "K" share class to the "Z6" share class, the Plan would save over $1.5 million per year in fees while maintaining identical investments.

103. Similarly, Defendants continue to invest over $116 million in the "K" share class of the Fidelity Contrafund even though the "K6" share class is available to the Plan and charges 45 bps — 16 bps less than the "K" share class for the identical mutual fund.

104. Finally, Defendants continue to invest over $200 million of Plan assets in the Vanguard Institutional Index Fund even though the Plan qualifies for the Vanguard Institutional Plus Index Fund, which would provide the exact same investment product for half the cost. Moving to the Institutional Plus Fund would save the Plan over $40,000 per year in needless fees.

105. The failure to select lower-cost share classes for the Plan's mutual fund options identical in all respects (portfolio manager, underlying investments, structure, and asset allocation) except for cost demonstrates

that either Defendants intentionally refused to move the Plan to a cheaper share class, or that it failed to consider the size and purchasing power of the Plan when selecting share classes and engaged in no prudent process in the selection, monitoring, and retention of those mutual funds. Either explanation constitutes a violation of Defendants' fiduciary obligations to the Plan. *Tibble v. Edison Int'l*, 843 F. 3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical — other than their lower cost — to products the trustee has already selected.").

106. Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options from November 28, 2011 to the present, Plan participants would have retained over $4.9 million more in their retirement savings, which would have grown even larger because it would have remained invested in the Plan.

107. Had the amounts invested in all of the mutual fund options instead been invested in institutional products such as collective trusts and separately managed accounts from November 28, 2011 to the present, Plan participants would have saved tens of millions more.

108. The high investment management, recordkeeping, and other administrative fees caused the Plan to incur Total Plan Costs — the total

percentage of the Plan's assets paid in fees each year — that were more than double what comparable plans paid.

109. The Investment Company Institute, and industry trade group, reports that the average participant in a plan with over $1 billion in it paid a Total Plan Cost of 27 bps. in 2014. The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014. [available at: https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf]. However, even though the Plan was much larger, with over $3 billion in assets, the Total Plan Cost paid by participants in this Plan in 2014 was 65 bps. Had the Plan instead paid 27 bps, the fees would have been more than $12 million lower per year. Similar excessive Total Plan Costs occurred throughout the Class Period.

### ii.  The Money Market Fund

110. Stable value funds and money market funds are two investment vehicles designed to preserve principal while providing a return.

111. Stable value funds are a common investment in defined contribution plans and in fact are designed specifically for use in large defined contribution plans.

112. The structure of stable value funds allows them to outperform money market funds in virtually all market conditions and over any appreciable time period. See, *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); see also Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the*

*Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006); Sudheer Chava, *Stable Value Analysis*, Working Paper, June 17, 2017 (available at: http://www.prism.gatech.edu/~schava6/SVReport.pdf).

113. Stable Value Funds hold longer duration instruments generating excess returns over money market investments, but utilize insurance contracts to negate the change in risk, so that to the investor returns are both higher and less volatile. Stable value funds also provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

114. Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[5]

115. The Plan nevertheless invested over $122 million in the Fidelity U.S. Government Reserves Money Market Fund, a money market fund that paid

---

[5] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

interest to the Plan of only 0.01%, while paying fees to Fidelity of as much as 2,500% higher than what was paid to participants.

116. In 2016, Defendants replaced Fidelity's money market fund with a retail money market fund managed by Vanguard. The Vanguard fund is substantially the same in terms of risk, structure, and underlying investments, but it has significantly lower expenses and, as a result, has consistently higher returns (30 bps in 2016 and over 50 bps in 2017).

117. As with their decisions concerning share classes of mutual funds and the decision not to use cheaper institutional products, the decision to use Fidelity's money market fund served to benefit Fidelity at a significant and predicable cost to the Plan.

118. The Plan also qualified for institutional money market funds, such as the Vanguard Prime Money Market Fund (Admiral Shares), which charges fees of only 10 bps and has outperformed the Plan's money market fund significantly prior to, and during, the Class Period. Given that the money market funds are virtually identical except for the institutional fund's lower fees and higher performance there is no prudent reason for Defendants to have invested in the retail money market funds.[6] Had Defendants invested in the retail Vanguard Federal Money Market fund instead the retail

---

[6] Catherine Valenti, How to Choose a Money Market Fund, March 28, 2011. ("The most important factor in choosing a money market fund is its expense ratio, which can eat away at a fund's return since most money market funds generally have comparable yields."). available at: https://www.thestreet.com/story/1365782/1/how-to-choose-a-money-market-fund.html

Fidelity money market fund, Plan would have received more than double the interest payments during the Class Period, a difference of over $1 million. Had Defendants invested in cheaper and better performing institutional money market products, the Plan would have received more than triple the interest payments during the Class Period.

119. In real terms, investors in this most-conservative option have lost 7% of their buying power over the Class Period. Had the Money Market assets been invested in the Plan's stable value fund or other comparable stable value funds, such as the Vanguard Stable Value Fund, the returns would have been over $7 million higher, as shown below.

| Fund | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|------|------|
| Vanguard Stable Value | 4.06% | 3.56% | 2.68% | 2.06% | 2.00% | 2.21% | 2.22% |
| Plan Stable Value | 4.00% | 3.00% | 3.75% | 1.15% | 1.10% | Unknown | Unknown |
| Inflation | 1.63% | 2.93% | 1.59% | 1.58% | -0.09% | 1.37% | 2.07% |
| Plan Money Market | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.01% | 0.04% |
| Vanguard Prime Money Mkt Adm. | 0.20% | 0.13% | 0.11% | 0.06% | 0.05% | 0.11%% | 0.55% |

120. By favoring the interests of Fidelity in the inclusion of the Fidelity Money Market Fund and by failing to invest in institutionally-priced money market funds, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

121. Defendants' fiduciary duties are among the "highest [duties] known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982). Consistent with these fiduciary duties, Defendants had a fiduciary duty to Plaintiff, the Plan, and the other participants in the Plan to offer only prudent investment options. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l.*, 135 S.Ct. 1823, 1829 (2015). Defendants therefore breached their fiduciary duty of prudence under ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B).

122. The Plan lost in excess of $7 million during the class period as a result of losses sustained by the Money Market Fund compared to Stable Value alternatives.

### iii. Selection of, and failure to remove, excessively expensive and poor performing funds

123. Defendants systematically maintained actively managed Fidelity and non-Fidelity mutual funds in the Plan despite high fees and poor performance in order to provide revenue sharing to Fidelity.

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee[1] |
|---|---|---|---|---|---|
| Fidelity U.S. Gov. Reserve | 26 bps | Money Market | VMRXX | 10 bps | 10 bps |
| Fidelity Contra | 61 bps | US Equity | VRGWX | 8 bps | 35 bps |
| Fidelity Growth | 77 bps | US Equity | VRGWX | 8 bps | 35 bps |
| Freedom Income | 43 bps | Non-target date balanced | VTINX | 13 bps | 26 bps |
| Freedom 2005 | 49 bps | Target Date | VTINX | 13 bps | 52 bps |
| Freedom 2010 | 49 bps | Target Date | VTENX | 13 bps | 52 bps |
| Freedom 2015 | 52 bps | Target Date | VTXVX | 14 bps | 52 bps |
| Freedom 2020 | 55 bps | Target Date | VTWNX | 14 bps | 52 bps |
| Freedom 2025 | 57 bps | Target Date | VTTVX | 14 bps | 52 bps |
| Freedom 2030 | 60 bps | Target Date | VTHRX | 15 bps | 52 bps |
| Freedom 2035 | 63 bps | Target Date | VTTHX | 15 bps | 52 bps |
| Freedom 2040 | 64 bps | Target Date | VFORX | 16 bps | 52 bps |
| Freedom 2045 | 64 bps | Target Date | VTIVX | 16 bps | 52 bps |
| Freedom 2050 | 64 bps | Target Date | VFIFX | 16 bps | 52 bps |
| WF Emerging Markets | 122 bps | International Equity | VEMIX | 11 bps | 54 bps |
| Ivy Mid-Cap Growth | 99 bps | Domestic Equity | VMGMX | 7 bps | 35 bps |
| NFJ Small Cap Value | 78 bps | Domestic Equity | VSIIX | 6 bps | 35 bps |
| PIMCO Total Return | 71 bps | Domestic Bond | VBIMX | 5 bps | 44 bps |
| Columbia Acorn | 97 bps | Int'l Equity | VFSNX | 12 bps | 54 bps |
| Harbor International Inst'l | 74 bps | Int'l Equity | VFWSX | 10 bps | 54 bps |
| Allianz AGIC Growth A | 101 bps | Domestic Equity | VRGWX | 8 bps | 35 bps |
| Blackrock Global Allocation I | 78 bps | Non-target date balanced | VSMGX | 14 bps | 26 bps |
| Loomis Value N | 57 bps | Domestic Equity | VSPVX | 8 bps | 35 bps |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee[1] |
|---|---|---|---|---|---|
| Thornburg International Value R5 | 98 bps | Int'l Equity | VTRIX | 7 bps | 54 bps |
| Blackrock US Opps Inst. | 101 bps | Int'l Equity | VEIRX | 17 bps | 54 bps |
| Calvert Capital Accumulation I | 83 bps | Domestic Equity | VMCIX | 5 bps | 35 bps |
| Dreyfus High Yield I | 70 bps | Domestic Bond | VWEAX | 13 bps | 44 bps |
| Invesco International Growth I (R5) | 105 bps | Int'l Equity | VWILX | 33 bps | 54 bps |
| Invesco Real Estate Inst'l (R5) | 100 bps | Other | VGSNX | 7 bps | 63 bps |
| Amana Income (Inv) | 112 bps | Int'l Equity | VRNIX | 8 bps | 54 bps |
| Loomis Value Y | 70 bps | Domestic Equity | VRVIX | 8 bps | 35 bps |
| American Funds Large-Cap Growth | 70 bps | Domestic Equity | VSGWX | 8 bps | 35 bps |
| JPMorgan Large Cap Growth Select | 93 bps | Domestic Equity | VSGWX | 8 bps | 35 bps |
| JPMorgan Large Cap Growth R5 | 54 bps | Domestic Equity | VSGWX | 8 bps | 35 bps |
| Templeton Global Bond Advantage | 63 bps | Int'l Bond | VTIFX | 7 bps | 70 bps |
| American Century Growth Invstmt. | 97 bps | Domestic Equity | VRGWX | 8 bps | 35 bps |

37

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee[1] |
|---|---|---|---|---|---|
| American Century Growth Inst. | 78 bps | Domestic Equity | VRGWX | 8 bps | 35 bps |
| Artisan Mid Cap Value | 96 bps | Domestic Equity | VMVAX | 7 bps | 35 bps |
| American Century Mid-Cap Value R6 | 63 bps | Domestic Equity | VMVAX | 7 bps | 35 bps |
| Wells Fargo Emerging Mkt Eq6 | 115 bps | Int'l Equity | VEMIX | 11 bps | 54 bps |
| PIMCO Total Return 3 AD | 75 bps | Domestic Bond | VBIMX | 5 bps | 44 bps |
| PIMCO Total Return P | 56 bps | Domestic Bond | VBIMX | 5 bps | 44 bps |
| American Funds Europacific Growth R5 | 53 bps | Int'l Equity | VWILX | 32 bps | 54 bps |
| American Funds Europacific Growth R6 | 50 bps | Int'l Equity | VWILX | 32 bps | 54 bps |
| American Funds Balanced R6 | 40 bps | Non-target date balanced | VSMGX | 14 bps | 26 bps |
| Credit Suisse Commodity Return | 78 bps | Other | COMIX | 65 bps | 63 bps |
| Manning and Napier Pro-Blend Moderate Term I | 81 bps | Non-target date balanced | VSCGX | 13 bps | 26 bps |

| Fund | Fee | Category | Alternative | Alt Fee | ICI Median Fee[1] |
|---|---|---|---|---|---|
| PIMCO Developing Local Markets Admin | 110 bps | Int'l Bond | PLMIX / VGAVX[2] | 87 bps / 32 bps | 70 bps |
| Dreyfus Boston Company Sm/Md Cap Growth I | 79 bps | Domestic Equity | VMGIX | 19 bps | 35 bps |

[1] Median fees paid by Plans with assets over $1 billion in the category identified according to The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014.

[2] The Vanguard Emerging Markets Government Bond Index Fund, VGAVX, began on May 31, 2013.

124. For example, the Plan has offered 15 different actively-managed Fidelity mutual funds. Of them, 14 have underperformed investible index benchmarks but only one, the money market fund, was removed as a Plan investment option by the Defendants.[7]

125. Non-proprietary funds offering to pay Fidelity revenue sharing were also added, and continued to be included, in the Plan despite higher fees and lower performance expectations for the future compared to index funds or other investments that would not pay such fees to Fidelity.

126. Collectively, the Plan's actively managed investments underperformed investible index alternatives each and every year of the Class Period, yet

[7] A second, the Freedom 2000 fund, was terminated by Fidelity and the assets moved into the Fidelity Income Fund.

the Plan continues to offer these funds because of the revenue sharing and other profits they provided to Fidelity.

127. These losses[8] are illustrated in the chart below:

| Year | Active Management Underperformance | Damages |
|------|-----------------------------------|---------|
| 2011 | 141 bps | $29,707,988 |
| 2012 | 98 bps | $8,258,015 |
| 2013 | 48 bps | $9,360,311 |
| 2014 | 255 bps | $58,142,463 |
| 2015 | 59 bps | $10,502,320 |
| 2016 | 153 bps | $30,575,172 |
| 2017 YTD[9] | 56 bps | $11,180,595 |
| **Total** | | **$157,726,864** |

128. Thus, predictably, for each of the past seven years the Plan would have been better off with index investments.

129. Defendants' inability to select actively managed funds that outperform the index is consistent with the vast weight of evidence that actively managed funds rarely outperform their indexes and fund pickers cannot reliably determine which mangers are likely to outperform in the future. Plaintiff does not believe Defendants should have been expected to "beat the

---

[8] Given the fundamental similarities between money market funds, the Fidelity Money Market Fund is not included in these calculations — additional damages from the inclusion of this Fund are addressed elsewhere.
[9] Through November 17, 2017.

market;" rather, that in accordance with their fiduciary duties, Defendants should have systematically reviewed the Plan investment options to ensure they were prudent given their performance and cost.

130. Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) ("the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

131. If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated*

*Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

132. To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000).

133. Nobel Laureate William Sharpe also reached the same conclusion that active managers underperform passive managers net of fees. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (January/February 1991).[10]

---

[10] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

134. The Plan's experience backs this up, with Defendants consistently failing to select managers who outperform investible alternatives.

135. Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds are expected to outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed option for the particular investment style and asset class.

136. Against this evidence and Defendants' own experience of failing to identify actively managed funds likely to outperform, the most plausible explanation for the active fund's inclusion in the Plan was to facilitate revenue sharing payments and investment management fees to Fidelity in a way that would not alert the Plan participants to these payments.

## VI. ERISA'S FIDUCIARY STANDARDS

137. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants  as fiduciaries of the Plan. ERISA § 404(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and —

    (A)   for the exclusive purpose of:

        (i)   providing benefits to participants and their beneficiaries; and

(ii)   defraying reasonable expenses of administering the plan;

[and]

(B)   with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct

of an enterprise of like character and with like aims;

(C)   by diversifying the investments of the plan so as to minimize the

risk of large losses, unless under the circumstances it is clearly

prudent not to do so[.]

138. ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405,

29 U.S.C. § 1105, states in relevant part that:

In addition to any liability which he may have under any other
provision of this part, a fiduciary with respect to a plan shall be liable
for a breach of fiduciary responsibility of another fiduciary with respect
to the same plan in the following circumstances:

(1)   if he participates knowingly in, or knowingly undertakes to
conceal, an act or omission of such other fiduciary, knowing such
act or omission is a breach;

(2)   if, by his failure to comply with section 404(a)(1) in the
administration of his specific responsibilities which give rise to
his status as a fiduciary, he has enabled such other fiduciary to
commit a breach; or

(3)   if he has knowledge of a breach by such other fiduciary, unless he
makes reasonable efforts under the circumstances to remedy the
breach.

139. Under ERISA, fiduciaries who exercise discretionary authority or control

over the selection of plan investments and the selection of plan service

providers must act prudently and solely in the interest of participants and

7

beneficiaries of the plan when performing such  functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

140. As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the  availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other  investment opportunities, such investments would not be prudent if they provided  a plan with less return, in comparison to risk, than comparable investments  available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

141. Pursuant to these duties, fiduciaries must ensure that the services provided to the  plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act  prudently and solely in the interest of the Plan participants and beneficiaries … in  determining which investment options to utilize or make available to Plan  participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service  providers] is reasonable.

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

142. A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of  plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and  beneficiaries, as prohibiting a

8

> fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The

Department of Labor has repeatedly warned:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee

Benefits Security Admin. (Feb. 2012),

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

143. In a separate publication, the Department of Labor writes:

> The Federal law governing private-sector retirement plans, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
>
>                                   \* \* \*
>
> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment

options made available to the  plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related  services generally are assessed as a percentage of assets invested. Employers  should pay attention to these fees. They are paid in the form of an indirect charge  against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been  deducted. For this reason, these fees, which are not specifically identified on  statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor

Employee Benefits Security Admin. (Dec. 2011),

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

144. ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), provides a cause of action against a party in interest, such as Providence, for participating in a breach of a fiduciary duty by an ERISA plan fiduciary.

145. ERISA § 405(a), 29 U.S.C. §1105(a), provides a cause of action against a fiduciary, such as Providence, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

146. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a  fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or  duties imposed on fiduciaries by Title I

ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VII. CLASS ACTION ALLEGATIONS

147. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

148. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of:

> All participants in the Plan from November 28, 2011 to the date of judgment. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

149. Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

> (A)   The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over seventy thousand persons, in

numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(B) The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty;; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(C) The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and

all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was and remains an investor in the Plan for the entirety of the Class Period.

(D) The class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(E) Class action status in this action is warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially impair or impede their ability to protect their interests.

(F) In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(G) In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII. CLAIMS FOR RELIEF

### A. Count I - Imprudent Conduct in Connection with Investments

150. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

151. Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

152. Defendants caused the Plan to invest billions of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which facilitated revenue-sharing payments back to Fidelity.

153. Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

154. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

155. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

156. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

**B.   Count II - Imprudent Conduct in Connection with Recordkeeping Fees and Total Plan Costs**

157. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

158. Defendants are responsible for selecting, monitoring, negotiating with and removing the Plan's Recordkeeper.

159. Defendants caused the Plan to pay, directly or indirectly, tens of millions of dollars to Fidelity during the Class Period. Fidelity's compensation, and the Total Plan Costs, were excessive and unreasonable given the services provided.

160. Defendants failed to monitor and control these costs despite lower-cost Recordkeeping alternatives.

161. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

162. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

163. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. A declaration that the Defendants breached their fiduciary duties under ERISA § 404;

B. An order compelling the Defendant to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

C. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

D. Such other equitable or remedial relief as may be appropriate, including the  permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's  investments in revenue-sharing mutual funds;

E. An order certifying this action as a class action, designating the Class to receive  the amounts restored or disgorged to the Plan, and imposing a

constructive trust for distribution of those amounts to the extent required by law;

F.   An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.   An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and post-judgment interest; and

H.   An order awarding such other and further relief as the Court deems equitable and just.

Dated: November 28, 2017                    Respectfully submitted,

/s/ Michael L. Murphy
Michael L. Murphy (WABA #37481)
Gregory Y. Porter
Mark G. Boyko (*pro hac vice* to be filed)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
mmurphy@baileyglasser.com
gporter@baileyglasser.com
mboyko@baileyglasser.com

**IZARD KINDALL & RAABE LLP**
Robert A. Izard (*pro hac vice* to be filed)
Mark P. Kindall (*pro hac vice* to be filed)
Doug P. Needham (*pro hac vice* to be filed)
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290
Email: rizard@ikrlaw.com
Email: mkindall@ikrlaw.com
Email: dneedham@ikrlaw.com

**KESSLER TOPAZ MELTZER CHECK, LLP**
Mark K. Gyandoh, (*pro hac vice* to be filed)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 822-0268
Facsimile: (610) 667-7056
Email: mgyandoh@ktmc.com