THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JENNY JOHNSON, individually and on behalf of a class of persons similarly situated, and on behalf of the Providence Health & Service 403(b) Value Plan,<br><br>Plaintiff,<br>v.<br><br>PROVIDENCE HEALTH & SERVICES, *et al.*,<br><br>Defendants. | CASE NO. C17-1779-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' motion to dismiss (Dkt. No. 14). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

I. **BACKGROUND**

Plaintiff Jenny Johnson brings this putative class action against Providence Health & Services ("Providence"), the Providence Health & Human Resources Committee ("HR Committee"), and other Providence employees currently unknown (collectively "Defendants") for alleged breach of fiduciary duties pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"). (Dkt. No. 1 at 1.) Plaintiff's lawsuit

deals with Defendants' management of Providence's employer-sponsored 403(b) Value Plan (the "Plan"). (*Id*.)

The Plan is a defined contribution retirement program established by Providence under the provisions of Section 403(b) of the Internal Revenue Code. (Dkt. No. 15-6 at 127.) Eligible employees may contribute a portion of their pay into different investment options and Providence provides a matching contribution up to a certain limit. (*Id*.) The Plan is administered by the HR Committee which selects, monitors, and removes the investment options offered to Plan participants.[1] (Dkt. No. 1 at 3.) The HR Committee contracts with Fidelity to provide recordkeeping services for the Plan. (Dkt. No. 15-6 at 130.) Fidelity provides a range of administrative services, such as maintaining account balances and providing participants with account support. (Dkt. No. 15-19 at 20–23.)

During the proposed class period[2], the Plan has grown from around 53,000 participants and $2.16 billion in assets, to over 76,000 participants and $4.3 billion in assets. (*Compare* Dkt. No. 15-2 at 3, 31, *with* Dkt. No. 15-6 at 3, 134.) The Plan offers participants more than 50 mutual funds and the option of a self-managed brokerage account. (Dkt No. 15-18 at 4–5.) Participants who do not direct their contributions into specific investments are defaulted into a Fidelity target-date mutual fund. (Dkt. No. 1 at 7.) Plaintiff has participated in the Plan during the entirety of the proposed class period. (*Id*. at 4–5.) Plaintiff's contributions were defaulted into the Fidelity Freedom 2040 Fund ("Freedom Fund"), which is the only fund she has invested in. (*Id*. at 5.)

Fidelity is compensated for its recordkeeping services in multiple ways. Fidelity receives direct annual payments out of the Plan's total assets based on an agreed upon contractual rate. (*Id*. at 10.) Fidelity also receives indirect payments through a practice known as "revenue sharing." (*Id*. at 12.) Under this practice, fund managers provide a portion of the asset-based fees

---

[1] Defendants say this is incorrect, but accept it as true for this motion. (Dkt. No. 14 at 8.)
[2] November 28, 2011 to the present. (Dkt. No. 1 at 4.)

paid by Plan participants—known as an expense ratio[3]—to administrative service providers such as Fidelity. (*Id*. at 11.) The plan sponsor agrees with fund managers on an applicable expense ratio with a portion going to the fund manager to cover its costs and profits, and a portion being "shared" with the plan service provider in exchange for administrative services. (*Id*. at 12.) The Plan includes dozens of mutual funds that made revenue sharing payments to Fidelity. (*Id*. at 14.)

## II. DISCUSSION

ERISA imposes duties of loyalty and prudence on the fiduciaries of employee pension benefit plans. 29 U.S.C. § 1104(a)(1)(A), (B). In two counts, Plaintiff claims that Defendants breached their fiduciary duties to the Plan. First, Plaintiff asserts Defendants breached the duties of prudence and loyalty by offering investment options that carried excessively high fees instead of lower-cost alternatives ("Investment Management Claims"[4]). (Dkt. No. 1 at 50–51.) Second, Plaintiff asserts Defendants breached the duties of prudence and loyalty based on the recordkeeping fees paid to Fidelity, which she asserts were excessive and unreasonable ("Recordkeeping Claims"). (*Id*. at 52–53.) As a result, Plaintiff alleges that Plan participants lost millions in retirement savings during the class period. (*Id*. at 29, 51–53.)

Defendants assert three overarching grounds for dismissal. First, Defendants argue Plaintiff's Investment Management Claims should be dismissed because Plaintiff lacks standing to challenge investment management decisions related to funds she never invested in. (Dkt. No. 14 at 12.) Under this theory, Plaintiff has standing to bring her Investment Management Claims only as they relate to the Freedom Fund. (*Id*. at 12.) Second, Defendants argue that Plaintiff's Investment Management and Recordkeeping claims fail to plausibly allege facts that demonstrate Defendants breached the duty of prudence. (*Id*. at 14) Finally, Defendants argue that Plaintiff

---

[3] Expense ratios are expressed as the percentage of a fund's expenses to assets held.

[4] For clarity, the Court labels these factual allegations "claims" because the complaint asserts Defendants breached the duties of loyalty and prudence in two separate counts—one dealing with the Plan's investments, the other with Fidelity's recordkeeping compensation. (Dkt. No. 1 at 50–53.)

fails to allege facts that demonstrate they violated the duty of loyalty as to both the Investment Management Claims and Recordkeeping Claims. (*Id*. at 28.)

### A. Legal Standards for Motion to Dismiss

Defendants assert Plaintiff's claims should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

#### 1. Rule 12(b)(1)

Under Rule 12(b)(1), a complaint must be dismissed if the plaintiff lacks Article III standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). The Supreme Court has determined that to establish standing a plaintiff must demonstrate her injury is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, ___U.S.___, 136 S. Ct. 1540, 1548 (internal quotation). In evaluating standing, a district court can consider affidavits and other evidence outside of the complaint. *See Table Bluff Reservation (Wiyot Tribe) v. Philip Morris*, *Inc.*, 256 F.3d 879, 882 (9th Cir. 2001).

#### 2. Rule 12(b)(6)

Under Rule 12(b)(6), a complaint should be dismissed if it "fails to state a claim upon which relief can be granted." To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Although the Court must accept as true a complaint's well-pleaded facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion. *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### B. Evidence Considered

Defendants ask the Court to consider the following extrinsic materials: (1) the Plan's Form 5500s filed with the Department of Labor from 2012 through 2016 (Dkt. Nos. 15-1–15-16); (2) fee disclosure summaries issued by Fidelity from 2012 through 2016. (Dkt. Nos. 15-4–15-8); (3) amendments to the Plan's recordkeeping agreement with Fidelity in 2011, 2012, 2013, 2015, and 2017 (Dkt. Nos. 15-19–15-23); (4) several fund prospectuses for funds offered by the Plan (Dkt. Nos. 15-8–15-13); and (5) the BrightScope/ICI Report referenced in the complaint. (Dkt. No. 15-7.) Defendants assert the Court can consider these materials because they are judicially noticeable and incorporated by reference into the complaint. (Dkt. No. 14 at 8.) Plaintiff objects to the Court's consideration of fund prospectuses "to negate the Complaint's well-plead allegations."[5] (Dkt. No. 18 at 14.)

The Court takes judicial notice of these documents, including the fund prospectuses, because they are publicly available and there is no dispute about their authenticity. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F.Supp.3d 1110, 1126 (C.D. Cal. 2015); *Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 972 (W.D. Wis. 2007). The Court will consider information from these documents insofar as they contradict allegations from the complaint. *See Sprewell*, 266 F.3d at 988.

### C. Rule 12(b)(1) Motion to Dismiss for Lack of Standing

Defendants argue that Plaintiff lacks standing to assert the majority of her Investment Management Claims because she did not suffer a particularized injury with regard to funds in which she never invested (Dkt. No. 14 at 12.) Accordingly, Plaintiff would have standing to challenge the allegedly excessive management fees associated only with the Freedom Fund. (*Id*.)

Plaintiff counters with two standing theories. First, she argues that the Ninth Circuit applies a standing analysis in class actions that does not require a named plaintiff to demonstrate the exact same injury as other class members. (Dkt. No. 18 at 15) (citing *Melendres v. Arpaio*,

---

[5] Plaintiff does not object to the Court's consideration of the other materials.

784 F.3d 1254, 1261 (9th Cir. 2015)). Second, since Plaintiff brings suit on behalf of the plan, her alleged injury must simply relate to "defendant's management of the Plan *as a whole*." (*Id*. at 16) (citing *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, Case No. CV15-1614-JLS, slip op. at 4 (C.D. Cal. Aug. 5, 2016) (emphasis in original).

When assessing Article III standing in class action lawsuits, the Ninth Circuit has adopted the so-called "class certification approach." *Melendres* 784 F.3d at 1264. In *Melendres*, the Ninth Circuit affirmed a district court's ruling that named plaintiffs in a civil rights class action dealing with racial profiling had standing to assert claims against defendants for a particular type of police stop, even though they were pulled over under a different stop regime than other class members. *Id*. at 1262–64. The Court noted that under the class certification approach "any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing." *Id*. at 1262 (citing NEWBURG ON CLASS ACTIONS § 2:6) (internal quotes omitted).

The *Melendres* court concluded that "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded . . . ." *Id*. at 1262. The class certification approach has subsequently been applied in various contexts. *See, e.g.*, *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017) (ADA claim); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 465 (N.D. Cal. 2017) (ERISA action).

The Court applies the class certification approach to this ERISA action. For the purposes of establishing standing, Plaintiff must plead a sufficient injury only as it relates to the Freedom Fund. Plaintiff alleges that the value of her retirement account was lowered as a result of Defendant's inclusion of the "K" share class Freedom Fund rather than an identical, lower-cost "Z6" share class. (Dkt. No. 1 at 28.) The Court concludes that this alleged injury—a loss in value to her retirement account—represents a sufficient injury to confer standing to Plaintiff. *See Braden v. Wal-Mart Stores*, Inc., 588 F.3d 585, 592 (8th Cir. 2009) (standing established based on allegations that excessive mutual fund fees lowered value of plaintiff's retirement account).

Defendants' arguments to the contrary deal more with the issue of Plaintiff's adequacy as the named-plaintiff—a question reserved for class certification—than her failure to allege a concrete, injury-in-fact. (Dkt. No. 19 at 8)[6]; *see Melendres*, 784 F.3d at 1262. Indeed, Defendants concede in their opening brief that Plaintiff has standing with regard to investment management fees related to the Freedom Fund. (Dkt. No. 14 at 13.) Confronted with *Melendres*, Defendants shift their argument and suggest that Plaintiff lacks standing because her allegations regarding the Freedom Fund fail to state a claim upon which relief can be granted. (Dkt. No. 19 at 8.) But Defendant's attack on the merits of Plaintiff's claim represents a distinct question from Plaintiff's standing to assert the claims of other class members.[7] *See Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n. 10 (9th Cir. 2008) ("[t]he jurisdictional question of standing precedes, and does not require, analysis of the merits").

The Court concludes that Plaintiff has standing to assert her Investment Management Claims regardless of whether she personally invested in the mutual funds held by unnamed class members. Defendants' motion to dismiss for lack of standing is therefore DENIED.

**D.     Rule 12(b)(6) Motion to Dismiss – Duty of Prudence**

ERISA requires that fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent . . . [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with a like aim." 29 U.S.C. § 1104(a)(1)(B). Plan fiduciaries must not only act prudently when selecting investments but have a continuing duty to monitor and remove imprudent ones. *See Tibble v. Edison Int'l*, ___U.S.___, 135 S. Ct. 1823, 1829 (2015). To survive a motion to dismiss, an ERISA plaintiff need not allege facts that directly address "the process by which the

---

[6] Defendants' reliance on *Lewis v. Casey*, 518 U.S. 343 (1996) (Dkt. No. 19 at 7), is unavailing because the *Melendres* court explicitly distinguished that case as dealing with the issue of redressability, not injury as it applies to standing. *See* 784 F.3d at 1263–64.

[7] Defendants are right that Plaintiff must allege a plausible claim regarding the Freedom Fund in order to survive a motion to dismiss. That issue is addressed in Sec. II.D.1 *infra*.

Plan was managed." *Pension Ben. Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citation omitted). Instead, it is enough for Plaintiff to make circumstantial allegations that allow the Court to draw reasonable inferences that a fiduciary's process in selecting investments was imprudent. *See Braden*, 588 F.3d at 596.

### 1. Investment Management Claims (Count 1)

Plaintiff's primary allegation in support of her Investment Management Claims is that the Defendants selected and failed to remove at least 17 mutual funds in a high-cost share class ("retail shares") when identical lower-cost share classes ("institutional shares") were available.[8] (Dkt. No. 1 at 22–23.) Plaintiff alleges that these share classes were the same in all respects— fund manager, investment strategy, asset allocation—except for expense. (*Id.*) Plaintiff asserts that the Plan, as a large employee-based retirement program, could have made the institutional shares available to its participants. (*Id.*) Plaintiff alleges that Plan participants paid between 6 and 111 percent more in fees for these 17 funds, than if the institutional shares were offered.[9] (*Id.*)

As one example, Plaintiff points to the Plan's selection of the PIMCO Developing Local Markets class "A" share, with an expense ratio of 110 basis points[10], when an equivalent institutional share of the fund was available for 85 basis points. (*Id.* at 23.) Moreover, Plaintiff alleges that Defendants eventually began to offer several of the institutional shares toward the

---

[8] Mutual funds often make "retail shares" available to all investors, whereas "institutional shares" are only offered only to an entity that makes a large minimum investment or has a minimum number of investors. (Dkt. No. 1 at 21.) The Court will use these terms for clarity.

[9] Plaintiff additionally argues that Defendants were imprudent by not offering other lower-cost investment products such as separate accounts, collective trusts, and comingled pools. (Dkt. No. 22–25.) The Court agrees with Defendants that their failure to offer such products was not imprudent because a 403(b) plan cannot offer them under federal tax law. (Dkt. No. 14 at 15) (citing 72 Fed. Reg. 41, 128, 41, 129).

[10] In regard to a mutual fund's expense ratio, one hundred basis points equals one percent.

end of the class period. (*See id.* at 26–28.)[11] Plaintiff additionally alleges that some of these funds, including the Freedom Fund, have underperformed investible index benchmarks. (*Id*. at 37 at 38.)[12]

Defendants counter with several reasons why the Plan's inclusion of the higher-cost share classes was not imprudent. First, they argue that the "use of higher-cost share classes permitted revenue sharing to be applied to defray the Plan's recordkeeping expenses." (Dkt. No. 14 at 16.) Defendants cite to Plaintiff's complaint to support their conclusion that "[t]he Plan's use of higher-cost share classes enabled the use of revenue sharing to compensate the Plan's recordkeeper." (Dkt. No. 19 at 10.) However, it is not clear from the record whether the revenue sharing associated with the 17 funds Plaintiff identified achieved a savings that offset the difference in expense ratios between the retail and institutional share classes. Indeed, one of Plaintiff's primary allegations in support of her Recordkeeping Claims is that the amount of revenue sharing provided to Fidelity by dozens of the Plan's funds was unreasonably high and caused participants to lose millions of dollars. (Dkt. No. 5 at 29–30.)

Defendants next assert that their investment selection process was prudent because some of the mutual funds the Plan offered were institutional shares. (Dkt. No. 14 at 14) (citing, as an example, the Calvert Mid-Cap Fund). Since the Plan offered some of these lower-cost funds, Defendants argue that "the selection of higher-cost alternatives is a function of participant choice, not fiduciary negligence." (*Id*. at 17.) Defendants cite to a case in which the Seventh Circuit upheld the dismissal of a similar ERISA action where the plaintiffs argued the plan

---

[11] For example, the Plan offered the "Investment class" of the American Century Growth Plan until 2016 when it switched to the identical "R6 class" with a lower expense ratio. (Dkt. No. 1 at 27.)

[12] This allegation distinguishes a case cited by Defendants for support. *Patterson v. Capital Grp. Companies, Inc.*, No. CV17-4399-DSF, 2018 WL 748104, at *5 (C.D. Cal. Jan. 23, 2018). There, the district court dismissed the plaintiff's breach of prudence claim because the complaint alleged only that Defendant could have switched into a cheaper institutional share sooner; not that some of the more expensive shares also performed poorly. *Id*.

fiduciary breached its duty of prudence by offering retail shares of certain mutual funds. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011). The court in *Loomis* determined that ERISA does not require plan fiduciaries to offer only "wholesale or institutional funds." *Id.* (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009))

The *Loomis* decision is distinguishable, however, because plaintiffs in that case argued that ERISA plan sponsors act imprudently by offering an overall lineup of investments that was unreasonably expensive. 658 F.3d at 670. The Court of Appeals disagreed, and ruled that the plan offered "an acceptable array of investment options" with expense ratios that were reasonable as a matter of law. *Id.* (citing *Hecker*, 556 F.3d at 586). In this case, by contrast, Plaintiff argues that Defendants' inclusion of specific retail shares of funds was imprudent because there were identical, lower-cost institutional shares available. (Dkt. No. 1 at 22.)

The Ninth Circuit has upheld similar ERISA claims that assert the selection and retention of overly-expensive mutual funds breached a plan fiduciary's duty of prudence. *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1137 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015) ("*Tibble I*"[13]). In *Tibble I*, the Court of Appeals affirmed the district court's ruling that a plan fiduciary acted imprudently by including retail-class shares of three specific mutual funds rather than lower-cost institutional alternatives. *Id.* at 1139. After a bench trial, the district court determined that the defendants had failed to investigate the possibility of offering the cheaper institutional share classes. *Id.* at 1137. In affirming the district court, the Court of Appeals highlighted three relevant findings of fact: (1) the challenged funds offered institutional shares available to the plan during the relevant time; (2) the institutional shares were between 24 and 40 basis points cheaper than the other funds offered; and (3) between the two share classes "there were no salient differences in the investment quality or management." *Id.*

//

---

[13] The Ninth Circuit rendered several decisions dealing with *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1080 (C.D. Cal. 2009).

The *Tibble I* decision offers two important insights to this case. First, Plaintiff makes similar allegations to those that the district court in *Tibble I* determined to be sufficient to prove the plan fiduciary acted imprudently. Plaintiff alleges that the 17 cheaper institutional share classes were available to the Plan at some point during the proposed class period, that the difference in expense ratios ranged from 2 to 25 basis points, and that the share classes were identical in all meaningful respects (*i.e.* manager, underlying investments, and asset allocation). (Dkt. No. 1 at 28.) Plaintiff also alleges that Defendants began to convert some of these retail share classes to the institutional share class by the end of the class period. (*Id*. at 26–28.)

Second, it is important to consider the procedural posture of *Tibble I*. The Court of Appeals was not reviewing an order on a motion to dismiss—as is the posture of this case—but a fully-developed factual record after both summary judgment and a bench trial. 729 F.3d at 1137. This illustrates that when assessing a fiduciaries' process for selecting, monitoring, and removing investment options, a court's inquiry is necessarily fact-heavy. *See Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017) (describing the "fact-intensive" approach adopted by the Ninth Circuit in *Tibble I*).

Here, Plaintiff has made plausible allegations, that when taken as true, allow the Court to reasonably infer that Defendants were imprudent in their selection and monitoring of certain retail shares of mutual funds. This specifically includes the Freedom Fund that Plaintiff invested in, which in 2016 began offering institutional shares ("Z6" shares) that were at least 10 basis points less than the available "K" shares. (Dkt. Nos. 1 at 28, 15-8 at 4.) The Plan had over $176 million invested in the Freedom Fund K shares at the end of 2016. (*Id*.) Courts in this circuit have denied motions to dismiss where similar allegations were made. *See, e.g.*, *Terraza*, 241 F. Supp. 3d at 1077 ("Terraza alleges that the Defendants could have offered the exact same investment option for a lower price based on the Plan's size. The Court can reasonably infer from this allegation that the Defendants acted imprudently by selecting the more expensive option, all else being equal."); *Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d at 466 (denying

motion to dismiss where plaintiff alleged plan fiduciary was imprudent in failing to "investigate the availability of lower-cost share classes.").

This is not to say Plaintiff will succeed on her claim that Defendants' investment management decisions were imprudent. On a more developed record, it may well be the case that Defendants acted prudently in investigating and deciding not to offer certain institutional shares of the mutual funds identified by Plaintiff. At the pleading stage, the Court concludes that Plaintiff has alleged sufficient facts to make her claims plausible. *See Iqbal*, 556 U.S. 662, 677–78. Defendants' motion to dismiss Plaintiff's Investment Management Claims as pled in Count 1 is DENIED.[14]

### 2. Recordkeeping Claims (Count 2)

Plaintiff makes several allegations to support her claim that Defendants violated the duty of prudence with respect to the compensation Fidelity received as the Plan's recordkeeper. Plaintiff alleges that the marketplace for retirement plan recordkeeping services is highly competitive, and Defendants were imprudent by not putting these services out for competitive bidding during the class period. (Dkt. No. 1 at 17.) Plaintiff asserts that "mega-plans like the Plan" are able to receive lower recordkeeping fees per plan participant because they have increased bargaining power. (*Id.* at 17–18.) Nonetheless, the compensation Fidelity received—both directly through fees paid out of the Plan's assets and indirectly through the receipt of revenue sharing—was unreasonably high when compared to prevailing market rates. (*Id.* at 19–20.) Plaintiff also asserts that starting in 2016, Fidelity began rebating to the Plan some of the revenue sharing payments it received from non-proprietary mutual funds. (*Id.* at 15.) Plaintiff argues that this demonstrates that Fidelity received unreasonably high fees before the rebating practice was instituted. (*Id.* at 15.)

---

[14] Having determined Plaintiff alleged sufficient facts regarding her Investment Management Claims, the Court need not address Plaintiff's additional allegations regarding the Plan's inclusion of certain actively managed funds and the Fidelity Money Market Fund. (Dkt. No. 1 at 30–39.)

Defendants counter that amendments to the Plan's recordkeeping agreement and annual fee disclosure documents contradict Plaintiff's allegations. (Dkt. No. 14 at 26–28.) First, Defendants argue that they renegotiated the recordkeeping agreement with Fidelity several times during the proposed class period, which resulted in lower fees for the Plan. (Dkt. No. 14 at 26) (citing Dkt. Nos. 15-9–15-23). Second, Defendants assert that Fidelity's annual fee disclosures contradict Plaintiff's allegations that Fidelity was receiving unreasonably high fees. (*Id.* at 26–27) (citing Dkt. Nos. 15-15–15-18). The Court has already determined that these documents are judicially noticeable, and the Court will consider them to the extent that they contradict conclusory allegations in the complaint. *See Sprewell*, 266 F.3d at 988.

Defendants amended the recordkeeping agreement with Fidelity at least four times during the proposed class period (2012, 2013, 2015, 2017). (*See* Dkt. Nos. 15-20–15-23.) Under the agreement in-force at the beginning of the class period, Fidelity received an annual recordkeeping fee of 20 basis points of total plan assets.[15] As the agreement was amended, however, the recordkeeping fee was lowered—to 13 basis points in 2012, 7.75 basis points in 2015, and ultimately to 6.75 basis points in 2017. (*See* Dkt. Nos. 15-20–15-23.)

As both parties point out, Fidelity also received compensation in the form of revenue sharing paid by dozens of the funds in the Plan. (*See generally* Dkt. No. 15-1.) Pursuant to an amendment to the agreement in 2012, Fidelity began to rebate a portion of revenue sharing payments it received above the annual recordkeeping fee. (Dkt. No. 15-21 at 2.) The Plan annually realized millions of dollars in savings as a result of this rebating. (*See* Dkt. Nos. 15-14 at 3, 15-18 at 3) ($1.4 million in 2012 and $2 million in 2016). The combined result of the lower annual recordkeeping fee and revenue sharing rebate was that the Plan's total recordkeeping costs fell during the relevant class period—both on a per-participant basis and as a percentage of total assets. (*Compare* Dkt. No. 15-14 at 3, *with* Dkt. No. 15-18 at 3.)

---

[15] The annual fee was subject to certain offsets to the extent assets were invested in funds managed by Fidelity. (*See* Dkt. No. 15-19 at 5.)

Considering these facts, Plaintiff has failed to plausibly allege that Defendant breached the duty of prudence based on its recordkeeping agreement with Fidelity. Plaintiff's allegation that Defendants failed to competitively bid the recordkeeping is diminished by the fact that Defendants repeatedly renegotiated the agreement to the benefit of the Plan. Indeed, the evidence before the Court directly contradicts Plaintiff's allegation that Defendant's "failed to monitor and control" the Plan's recordkeeping costs. (Dkt. No. 1 at 52.) In 2012, the Plan's total cost per participant was $56.49, or 0.13 percent of total assets, but by the end of 2016, it had fallen to $39.40 and 0.078 percent respectively.[16] (*Compare* Dkt. Nos. 15-14 at 3, *with* 15-18 at 3.)

Moreover, Plaintiff does not allege with any specificity how competitively bidding the recordkeeping contract would have provided a greater benefit to the Plan than it received through its four rounds of renegotiation with Fidelity. Plaintiff's allegation that there were lower-cost recordkeeping alternatives available is conclusory. Other than stating that "lower administrative expenses are readily available" for large defined contribution programs like the Plan, Plaintiff does not plausibly allege that another recordkeeper would have provided the same services at a lower cost than Fidelity. *See Young v. GM Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009) (affirming the dismissal of an excessive recordkeeping fee claim where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered"). The Court cannot draw a reasonable inference from these allegations that Defendants could have obtained lower-cost recordkeeping services through a competitive bid.[17]

---

[16] Plaintiff cites to *Marshall v. Northrop Grumman Corp.*, No. CV 16-06794 AB (JCX), 2017 WL 2930839, at *10 (C.D. Cal. Jan. 30, 2017) to support her claim. In *Marshall*, the district court found the plaintiff's claim of excessive fees plausible because the number of plan participants dwindled during the class period and the recordkeeper provided less services. In this case, the exact opposite is true, as plan participants have increased and Fidelity's fees have correspondingly fallen.

[17] Plaintiff's passing reference in the Complaint to four out-of-jurisdiction cases which discussed apparently reasonable levels of per-participant recordkeeping fees does not provide a plausible benchmark for this Court to determine whether Fidelity's compensation was unreasonably high vis-à-vis other recordkeeping providers. (*See* Dkt. No. 1 at 20.)

Other allegations in the complaint regarding Fidelity's recordkeeping compensation are either conclusory or contradicted by judicially noticeable documents. Plaintiff's allegation that Fidelity did not begin rebating revenue sharing until 2016, is directly contradicted by the 2012 amendment to the fee agreement that instituted such rebating. (*Compare* Dkt. No. 1 at 15, *with* Dkt. No. 15-21 at 3.) Plaintiff's allegations regarding the total annual recordkeeping fees Fidelity earned are simply incorrect when compared with the annual fee disclosures that document those figures. (*Compare* Dkt. No. 1 at 19, *with* Dkt. No. 15-8 at 3) (Complaint: $5,794,655 in 2016; fee disclosure: $3,236,055 in 2016.) Finally, Plaintiff's allegation that Fidelity received revenue sharing that far exceeded a reasonable market rate is conclusory, insofar as Plaintiff provides no facts regarding the reasonable market rate for similar defined contribution plans.

For these reasons, Defendants' motion to dismiss Plaintiff's Recordkeeping Claims as pled in Count 2 is GRANTED. Plaintiff's claim is DISMISSED without prejudice and with leave to amend the complaint to cure the noted deficiencies.

### E.     Rule 12(b)(6) Motion to Dismiss – Duty of Loyalty

Under ERISA's duty of loyalty, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty prohibits plan fiduciaries from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Terraza*, 241 F. Supp. 3d at 1069 (quoting Restatement (Third) of Trusts § 78 (2007)). The Supreme Court has stated that the duty of loyalty requires fiduciaries to make decisions "with an eye single toward beneficiaries' interests." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

Defendants are correct that in pleading her duty of loyalty claims, Plaintiff relies almost entirely on the facts alleged in support of her breach of prudence claims. (*See* Dkt. No. 1 at 50–52.) Plaintiff asserts her loyalty claims in a single paragraph in both Counts 1 and 2 (respectively

titled "*Imprudent Conduct* in Connection with Investments" and "*Imprudent Conduct* in Connection with Recordkeeping Fees and Total Plan Costs") (*Id.*) (emphasis added). However, the Court can still find a breach of the duty of loyalty in spite of this overlapping pleading, so long as the complaint includes sufficient facts that plausibly state a claim. *See Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 915 (W.D. Mo. 2017) (finding that the same factual allegations support claims for a breach of the duties of loyalty and prudence).

### 1. Investment Management Claims (Count 1)

The crux of Plaintiff's breach of loyalty claims are that Defendants' investment management decisions benefited Fidelity at the expense of plan participants. (Dkt. No. 18 at 31.) Plaintiff alleges that Defendants' failure to select lower-cost share classes for the Plan "demonstrates that either Defendants intentionally refused to move the Plan to a cheaper share class, or that it failed to consider the size and purchasing power of the Plan when selecting share classes . . . ." (Dkt. No. 1 at 28–29.) The complaint also alleges that Defendants' decision "to use Fidelity's money market fund served to benefit Fidelity at a significant and predictable cost to the Plan." (*Id*. at 32.) Plaintiffs also assert that "Defendants systematically maintained actively managed Fidelity and non-Fidelity mutual funds in the Plan despite high fees and poor performance in order to provide revenue sharing to Fidelity." (*Id*. at 34.)

Defendants argue that Plaintiff has not included specific allegations showing that they acted disloyally to the Plan. (Dkt. No. 19 at 16.) Specifically, Defendants assert that Plaintiff has not alleged facts that show the "Plan fiduciaries were motivated to benefit anyone other than the Plan participants when making the decisions challenged here." (*Id*.) The Court disagrees. Having determined that Plaintiff plausibly alleged her breach of prudence claims regarding Defendants' investment management decisions, the Court concludes there is reasonable inference that Defendants breached their duty of loyalty. *See supra* Sec. II.D.1.

Some of the Fidelity investment products that were offered, for example the Freedom Fund, could have benefited Fidelity—in the form of a higher expense ratio—at the cost of Plan

participants. While the complaint provides no direct evidence of self-dealing or preferential treatment for Fidelity, the inclusion and retention of various Fidelity investment products is circumstantial evidence that Defendants did not act "with an eye single toward beneficiaries' interests." *Pegram* 530 U.S. at 211. For those reasons, Defendants' motion to dismiss Plaintiff's breach of loyalty claim as pled in Count 1 is DENIED.

### 2. Recordkeeping Fees (Count 2)

Plaintiff alleges that Defendants breached the duty of loyalty based on its recordkeeping agreement with Fidelity. (Dkt. No. 1 at 52.) Plaintiff relies on the same factual allegations that she offered in support of her breach of prudence claim in count 2. (*Id.*) Having determined that Plaintiff failed to plausibly allege a breach of prudence in regard to Defendants' recordkeeping agreement with Fidelity, the Court finds that Plaintiff has failed to plausibly allege a breach of the duty of loyalty based on the same conduct. *See supra* Sec. II.D.2. Therefore, Defendants' motion to dismiss Plaintiff's claim for breach of the duty of loyalty as pled in Count 2 is GRANTED. The Court grants Plaintiff leave to amend her complaint in order to cure these deficiencies.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 14) is DENIED in part and GRANTED in part. Plaintiff's claims in Count 2 are DISMISSED without prejudice and with leave to amend. Plaintiff must file an amended complaint within 21 days of this order, or those claims will be dismissed with prejudice. Plaintiff may not add claims or defendants in her amended complaint.

DATED this 22nd day of March 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE